[Civ. No. 2489. Third Appellate District.—November 16, 1922.]

## P. J. GIOVANNONI, Appellant, v. GEO. H. BARTMANN, Respondent.

[1] SALES—TRANSFER OF CORPORATE STOCK—PAYMENT—PASSAGE OF TITLE.—Where a stockholder indorses his stock certificate in blank and leaves it with the president of the corporation to be delivered in the event of its sale, and thereafter the stockholder meets the person desiring to purchase the stock, and they come to an agreement for its sale, and the purchaser gives his check for the full amount of the purchase price and the seller delivers his order on the president for the certificate, the transaction constitutes a sale and passes title to the purchaser.

[2] ID.—SALE OF BANK STOCK—MISREPRESENTATIONS AS TO VALUE—EVIDENCE—FINDINGS.—In this action for money had and received, to recover the purchase price of bank stock sold by defendant to plaintiff upon the ground that the defendant falsely represented to plaintiff the value of said stock, the trial court was justified in finding that defendant, although a stockholder and director of the bank, was without knowledge of the insolvency of the bank at the time of the sale and that he did not make the representations alleged by plaintiff, although the published reports of the financial condition of the bank, attested by defendant, contained gross misrepresentations.

[3] ID.—RESCISSION—RELIANCE UPON FINANCIAL REPORT—EVIDENCE.—Such action having been for rescission of the contract and for money had and received through defendant's misrepresentations, and not an action to recover damages for deceit or misrepresentation, it was not sufficient for plaintiff to show that the financial report attested by defendant contained false statements, but the burden was on him to show that he placed his reliance upon them in making the purchase, although he did not have to show that they were the sole inducement.

[4] ID.—FINANCIAL REPORT AS INDUCEMENT—PLEADING—EVIDENCE—INFERENCE.—The plaintiff in such action not having alleged that he was influenced in making the purchase by the published reports, it was fair to infer that he did not have such reports in mind when he filed his answer to defendant's cross-complaint, and from that inference, considered in connection with the uncertainty of his testimony relative to his knowledge of the contents of the reports, it was not unreasonable to conclude that he did not have them in mind at the time of the purchase; and it could not be said that the evidence in the case was such as to compel a finding that such published reports were among the inducements which caused the plaintiff to buy the stock.

[5] ID.—VALUE OF BANK STOCK—WANT OF CONSIDERATION—MUTUAL
MISTAKE—RESCISSION.—The consideration for the payment of the
purchase price having been the shares of bank stock, not the value
thereof, the fact that the stock was of no intrinsic value did not
constitute a total want of consideration for the contract and did not
entitle the purchaser to a rescission on the ground of mutual
mistake, even though both parties were mistaken as to its value.

APPEAL from a judgment of the Superior Court of
Madera County. Stanley Murray, Judge. Affirmed.

The facts are stated in the opinion of the court.

A. M. Drew and Whitehurst & Logan for Appellant.

John W. Maloy, Guy Windrem and Fee & Ring for Respondent.

FINCH, P. J.—The complaint sets up a cause of action
for money had and received on the thirteenth day of January, 1920, in the sum of $1,650. The answer denies the
allegations of the complaint and by way of cross-complaint
the defendant alleges that on said day the defendant, being
the owner of ten shares of the capital stock of the First
National Bank of Newman, California, sold the same to
plaintiff for the sum of $1,650, which the plaintiff then
paid; that within sixty days after such sale the bank was
declared insolvent and taken over by the controller of currency and a receiver placed in charge thereof; that March
2, 1920, the controller levied an assessment of $100 a
share on the capital stock of the bank and the receiver notified defendant to pay such assessment on the ten shares sold
to plaintiff; that thereupon the defendant notified plaintiff
to pay the same, but that he refused; that the defendant
then paid the assessment pursuant to a stipulation that such
payment should not prejudice any right the defendant might
have for the recovery of the amount thereof from plaintiff;
that the sale of the stock was made without knowledge, information or belief on the part of the defendant that the
bank was to be closed or declared insolvent or that it was
"otherwise than solvent, and conducted as an honest and
successful business enterprise." The prayer of the cross-complaint is for recovery of the $1,000 paid on the assessment. The answer to the cross-complaint, in addition to

the denials of many allegations thereof, avers that, at the time of the alleged sale of the stock, the defendant was and for a long time prior thereto had been a director of the bank, and as such had knowledge of its affairs; that on the day of the alleged sale the defendant, "at and in the First National Bank of Newman, . . . wrongfully, unlawfully and fraudulently and with intent to induce this plaintiff to purchase ten shares of the capital stock, . . . represented and stated to this plaintiff . . . that the said stock was of the value of" $188 a share and that the bank was about to declare a dividend of $38 a share, that the defendant warranted the stock to be of the value of $188 a share; that the plaintiff relied on said statements and believed them to be true and, so relying and believing, paid the defendant $1,650 for such stock; that the bank was insolvent and the stock thereof worthless at the time of the alleged sale, to the knowledge of defendant. In the answer to the cross-complaint the plaintiff prays for a rescission of the contract of sale and for recovery of the $1,650 paid thereon to defendant. The court found in favor of defendant on all the issues which are material on this appeal and gave defendant judgment for the sum of $1,000, with interest.

The First National Bank of Newman was incorporated with a capital of 1000 shares of the par value of $100 each and carried a reserve of $25,000. Wm. J. Burris and Frank P. Gomez were president and cashier respectively and had been such for a number of years. The defendant served as one of the directors from January 14, 1919, to January 13, 1920, and attended all meetings of the board from the time of his election to and including September 3, 1919. Having changed his residence and place of business from Newman to Madera in August, he attended no board meetings after September 3d. The controller of currency took over the affairs of the bank January 23, 1920, and levied an assessment of $100 a share on the capital stock, as alleged in the cross-complaint, which the defendant paid on the ten shares involved in this suit. The receiver succeeded in collecting about eighty per cent of the total assessment. After applying the amount so collected the remaining liabilities far exceeded the value of the total assets. At the time the bank was closed it carried on its

books, as assets, bills receivable in the sum of $1,075,961.54 and other assets to the amount of $150,067.44. The receiver classified the bills receivable as follows: good, $204,264.06; doubtful, $361,110.01; and worthless, $510,587.47; and the other assets: good, $56,628.54; doubtful, $93,438.90. Prior to the time his deposition was taken, November 4, 1921, the receiver had collected $64,803.36 on promissory notes which he had classified as worthless and $201,393.40 on those classified as doubtful. Among the assets classified as worthless were promissory notes forged by the president and cashier aggregating the sum of $223,000. The receiver testified that these forgeries had continued through a period of eight or ten years. All except a few. of the persons whose names were forged to these notes resided in the vicinity of Newman. In some instances fictitious names were signed to the spurious notes. A large number of the forged notes were signed by mark, different clerks in the bank signing as witnesses at the request of the president, apparently without seeing the persons whose names appeared thereon as makers. About $250,000 was loaned to bean growers and others without security, and their notes renewed from time to time. On these notes the receiver was able to collect but about five per cent of their face value. These loans were made prior to defendant's term of office and seem to have been made on the prospect of a continuance of war prices. During the subsequent depression in the bean market the growers were unable to pay and their notes were renewed from time to time, the board of directors approving the renewals made during defendant's term. The receiver testified that very few loans were made during defendant's term. Whether such as were made were good or not does not appear. The minutes of July 8, 1919, contain the following: "All loans 6860 to 6911 inclusive examined and approved. All loans, property of this bank, also examined and approved." The defendant testified: "These notes were all made prior to my time and the men who were on the board of directors had been living in the vicinity of Newman, some of them from anywhere from 15 to 30 years, and they knew the conditions and they had made these loans and approved them and when they came up for renewals there was not any reason for me doubting their motion to renew them and O. K. the notes; I just followed in behind

them and signed the book. .... I never investigated them any more than what the men said who were on the board of directors." The receiver found on file in the bank a letter from the controller calling attention to the low reserve and past due paper and instructing the directors to increase their reserve and get rid of their past due paper. The record does not show when this letter was received. Early in December, 1919, the chief bank examiner and Mr. Day of the Federal Reserve Bank called the members of the board, including defendant, into conference and instructed them not to loan any more money until they could reduce the bank's indebtedness to the Federal Reserve Bank, then amounting to about $190,000, according to defendant's testimony. At that time the members of the board gave their personal note to the Reserve Bank for the sum of $50,000 as further security. The bank examiner had regularly investigated the affairs of the bank without discovering its insolvency or the numerous forgeries of the president and cashier. The defendant testified that at the December conference a proposition to increase the capital stock was discussed and, relative to the price at which the new stock should be sold, the bank examiner said: "I, myself, would possibly pay in the neighborhood of $135 a share for it now." This testimony was not contradicted.

January 13, 1920, a meeting of the stockholders was held for the purpose of electing a new board of directors and increasing the capital stock. Both the plaintiff and the defendant attended this meeting, the former being the owner of one share of the stock. At this meeting the president stated that the bank was in a flourishing condition and that the capital stock was of the value of $188 a share. It was proposed to sell the new issue of stock at $150 a share and to declare a dividend of $38 a share in favor of the old stockholders, thus placing the old and the new stockholders on an equality. There were not enough stockholders represented at the meeting to increase the stock, but a number of persons subscribed for new stock, in the event it should finally be issued. The plaintiff so subscribed for ten shares.

The testimony of the parties is sharply conflicting as to what occurred relative to the sale of defendant's stock to plaintiff. In view of the findings in favor of defendant, the

question is whether the findings are supported by the evidence, and hence only the defendant's testimony need be noticed. The defendant testified that plaintiff was desirous of purchasing sufficient stock to qualify for the office of director; that at the stockholders' meeting he sought to purchase the stock of another director, who replied that he did not care to sell; that the plaintiff then said to defendant: "Well, Dr. Bartmann, you are moving away and leaving town . . . you'd better sell me your stock," and that defendant replied: "I don't believe I care to sell it"; that immediately after the meeting the plaintiff again sought to buy the stock and defendant replied that he had given the president of the bank "the refusal of it" if defendant should decide to sell; that the plaintiff said he would take it if the president did not buy it; that the defendant interviewed the president and learned that he did not desire to purchase the stock; that defendant then indorsed the certificate of stock in blank and left it with the president to be delivered in the event of its sale, thinking he would not see the plaintiff again; that shortly thereafter he again met the plaintiff and they came to an agreement for the sale of the stock at $165 a share; that the plaintiff gave his check for the purchase price and the defendant delivered his order on the president for the certificate of stock. The defendant further testified that he did not make the representations alleged in the answer to the cross-complaint. The defendant deposited in the bank the $1,650 received for his stock. His check for $1,000 was paid January 22, 1920, leaving a balance in his account of $689.87 at the time the bank was closed. July 12, 1919, the defendant attested as correct a report to the controller of the financial condition of the bank at the close of business on June 30th, in which the doubtful and worthless notes were listed as resources. The defendant testified that he attested the report on the assurance of the cashier, who had verified it, that it was correct. The report was published in a local newspaper. The defendant had attested other reports prior to that time during his term.

[1] That the transaction between the parties constituted a sale and passed title to plaintiff seems clear. The parties agreed upon a present transfer and the thing to be transferred was identified. (Civ. Code, sec. 1140; *Young* v. *New*

*Pedrara Onyx Co.,* 48 Cal. App. 1 [192 Pac. 55]; *Johnston*
v. *Laflin,* 103 U. S. 800 [26 L. Ed. 532, see, also, Rose's
U. S. Notes].)

[2] The court was justified in finding from the fore-
going facts that the defendant was without knowledge of the
insolvency of the bank at the time of the sale and that
he did not make the misrepresentations alleged by plain-
tiff. It is apparent that both parties thought the stock was
valuable. It is not probable that the defendant would have
left so large a sum on deposit in the bank if he had doubts
as to its solvency. It is not surprising that the defendant
should have been deceived into the belief that the bank was
sound when the experienced bank examiner was equally de-
ceived. Whether or not the defendant was negligent in the
discharge of his duties as director, there is sufficient evi-
dence to support the finding that he acted in good faith in
the sale of his stock to plaintiff.

The published reports of the financial condition of the
bank, attested by defendant, contained gross misrepresenta-
tions, though the defendant believed the report to be correct.
It was the report itself, and not the signature of the cashier,
which the defendant attested. The attestation was a posi-
tive statement that the condition of the bank was as repre-
sented in the report. (U. S. Rev. Stats., sec. 5211 [6 Fed.
Stats. Ann., 2d ed., p. 790, U. S. Comp. Stats., sec. 9774];
*Gerner* v. *Mosher,* 58 Neb. 135 [46 L. R. A. 244 [78 N. W.
384].) "The making and publishing of the reports are not
merely for the information of the Controller, but are to
guide the public, and he who buys stock in a bank in reli-
ance upon the reports has a right of action under sec.
5239, Rev. Stat. (Comp. Stats. 1916, sec. 9831), against any
officer or director who, knowing its falsity, authorizes such
report." (*Chesbrough* v. *Woodworth,* 244 U. S. 72 [61
L. Ed. 1000, 37 Sup. Ct. Rep. 579]; *Macdonald* v. *de Frem-
ery,* 168 Cal. 189 [142 Pac. 73].) "While the statute
furnishes the exclusive rule for determining whether its pro-
visions have been violated or not, this does not prevent the
application of the common-law rule for measuring viola-
tions of common-law duties." (*Bowerman* v. *Hamner,* 250
U. S. 504 [63 L. Ed. 1113, 39 Sup. Ct. Rep. 549].) [3]
This is not an action to recover damages for deceit or mis-
representation but for rescission of the contract and for

money had and received through defendant's misrepresenta-
tions.   Where stock is purchased from a corporation through
misrepresentation ''the purchase of shares may be set aside,
and the purchaser relieved from his liability as a contribu-
tory, without any knowledge of the untruth on the part of
those who issued the document.   Recovery from the direc-
tors personally requires knowledge of the untruth on their
part, or else that the statement should be made under such
circumstances that knowledge will be imputed to them.''
(Pomeroy's Equity Jurisprudence, 4th ed., sec. 881.)   Ap-
pellant contends that where a director sells his own stock
through misrepresentation, however innocently made, he is
liable in an action for the purchase price received.   ''An
action at law for fraud in making false representations
and a suit in equity for the rescission of a contract on
the ground of misrepresentations are founded on distinct
theories.   The former is based on an intentional deceit,
which of course includes a knowledge of the falsity of what
is affirmed.   But the latter is aimed at the undoing of a
bargain which circumstances would render it inequitable to
enforce and the restoration of the parties to the *status quo,*
and this may be consistent even with entire innocence and
ignorance on the part of the person making the misrepre-
sentations, or with his belief in their truth.''   (Black on
Rescission and Cancellation, sec. 102.)   In *Alvarez* v. *Bran-
nan,* 7 Cal. 503, 507 [68 Am. Dec. 274], it is said: ''A
party will always be held to make good his statement in the
form in which he makes it.   If he states a thing as true
in general terms without qualification, then he is presumed
to do so upon his own knowledge, or at his own peril, and
must make good his assertion.''   In *Groppengiesser* v. *Lake,*
103 Cal. 37, 42 [36 Pac. 1036], an action for the rescission
of a contract because of fraudulent representations, the
court said: ''It does not matter that defendant did not
know that what he stated was untrue, or that he believed
it to be true.''·

Whether or not appellant's contention be correct, it is not
sufficient for the plaintiff to show that the financial report
contained false statements, but he must prove that he placed
his reliance upon them in making the purchase, although he
need not show that they were the sole inducement.   (*Mac-
donald* v. *de Fremery, supra.*)   The plaintiff testified that he

made the purchase on the information obtained from the published reports, the statements of the president at the stockholders' meeting, and the representations made by the defendant at the time of the transaction.   On cross-examination he testified as follows: "Q. I want to ask you if you have an independent recollection now of having read the financial report of the First National Bank of Newman, in the West Side Index, a newspaper published on the 22nd day of July, 1919? A. I am reading it and I have read all the issues of the Index and I take an interest to look at the way the bank was progressing; I read them all; now, if you ask me if I read a certain number, I read them all, because I was used to reading them.   Q. You have no independent recollection of having read this particular number at that time? A. I have read them all. . . . As I say, I am reading the whole papers very carefully and every issue almost and if I miss an issue, I will go into the office and get it.   Q. Now, the only recollection that you have as to having read these various reports, published in these various issues of this paper which has been introduced here in evidence, is that you do read the paper and that is all the recollection you have? A. I do read them all very carefully, yes.   Q. That is the only reason that you have for believing that you read this particular one, is that correct? A. Well, that is just the way I am expressing myself. . . . Q. Let me ask you what was the report of the total resources . . . as published . . . July 21, 1919? A. It was over a million.   Q. Will you discard that paper; now, what was the total liabilities at that time? A. I was just reading, taking the figures of the Newman Bank and the First National Bank, to see how they were getting up. Q. If this total published here shows $993,751.20 instead of away over a million, as you assumed it to be, why you were not so much influenced by this . statement, as you thought you were? A. Aint it over a million? I don't remember; I read one below, one million; aint this over a million, $1,161,000, that is what I was going by.   Q. That is loans and discounts.   A. That is all Greek to me.   Q. Then you just went by what you saw here at the top? A. Up here, the way I seen it was; that is the way we took it, the Newman Bank was so much that they had in etc., and the First National Bank, we was considering the First

National Bank; it was much better than the Newman Bank. Q. Now, that also applied to the other issues in this paper, your testimony applies to all the other issues in this paper which have been introduced here in evidence? A. They have." In connection with this testimony, the court may have logically considered the fact that the only misrepresentations averred by the plaintiff were those alleged to have been made at the very time of the transaction. [4] Since the plaintiff did not allege that he was influenced in making the purchase by the published reports, it is fair to infer that he did not have such reports in mind when he filed his answer to the cross-complaint, and from this inference, considered in connection with the uncertainty of his testimony relative to his knowledge of the contents of the reports, it was not unreasonable to conclude that he did not have them in mind at the time of the purchase. While it cannot be said that the evidence is insufficient to support a finding that the published reports were among the inducements which caused the plaintiff to buy the stock, neither can it be said to be such as to compel a finding to that effect.

[5] Appellant urges that since the stock was of no intrinsic value (whether or not it had a market value not appearing from the record), there was a total want of consideration for the contract, and that, even if both parties were mistaken as to its value, appellant was entitled to a rescission on the ground of mutual mistake. This contention finds support in the case of *Neale* v. *Wright,* 130 Ky. 146 [112 S. W. 1115]. The case cited, however, seems to be in conflict with the decisions of this state and with the great weight of authority in other states. The consideration for the payment of the purchase price was ten shares of bank stock, not the value thereof. There was no mistake as to what each party was to receive. In *Sutro* v. *Rhodes,* 92 Cal. 117 [28 Pac. 98], the plaintiff sought to recover money paid for worthless bonds, both parties believing them to be valuable at the time they were transferred. The court said: "In the case at bar, as in *Otis* v. *Cullum,* 92 U. S. 447 [23 L. Ed. 496, see, also, Rose's U. S. Notes], the appellants 'got exactly what they intended to buy, and did buy,' that is, certain written instruments." To the same effect is the decision in *Harvey* v. *Dale,* 96 Cal. 160 [31 Pac. 14]:

"Where a party obtained what he contracted for, he cannot avoid his contract on the ground that what he received is less valuable than he supposed or that it has no value at all, unless he shows fraud or mistake *as to the subject matter of the contract.*" (Black on Rescission and Cancellation, sec. 166.) In *Peck Colorado Co.* v. *Stratton,* 95 Fed. 741, where the defendant sought to avoid payment of the purchase price of stock which was worthless, the court said: "The stock was the definite thing that he purchased, and he received the consideration selected by him. As distinguished from the consideration, the defendant seeks to set up the motive of the contract, and then to show that his expectation of deriving valuable benefits from this purchase . . . has not been realized; but such motive is not to be confounded with the consideration of the contract." "The rule of *caveat emptor* applies as well to the sale of stocks as of chattels. The vendor can only be made liable for misrepresentation or fraud. Here, although the stock was worthless, there is not sufficient proof of any representation of its value, or any act that would amount to fraud either at law or in equity." (*Renton* v. *Maryott,* 21 N. J. Eq. 123. See, also, *Hunting* v. *Downer,* 151 Mass. 275 [23 N. E. 832]; *Long* v. *Symonds,* 216 Mass. 595 [104 N. E. 476]; *Jones* v. *Garlington,* 44 S. C. 533 [22 S. E. 741]; *Rothmiller* v. *Stein,* 143 N. Y. 581 [26 L. R. A. 148, 38 N. E. 718].)

It is not contended that, if the transfer of the stock is binding upon plaintiff, he is not liable to the defendant for the assessment paid by the latter. The payment was not voluntary, but under compulsion. (6 Fed. Stats. Ann., 2d ed., p. 723 [U. S. Comp. Stats., sec. 2689]; see *People's Home Savings Bank* v. *Stadtmuller,* 150 Cal. 106, 109 [88 Pac. 280].)

The judgment is affirmed.

Anderson, J., *pro tem.,* and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 15, 1923.

All the Justices present concurred.